Your Honor, this is the second case of the morning call, 218-0712. In re the Marriage of Gloria Maria Gildersleeve and Walter R.L. Johnson. Mr. Johnson, the apologist, is represented by Bradford L. Bennett, and Ms. Gildersleeve, represented by Brett T. Williams. Good morning. Mr. Bennett? May I step forward? I'm sorry. Thank you. I'm still getting organized here. I apologize. If you give me one second to just make sure I've got all the papers I need. And then Justice Jorgensen is not here today. She regrets very much that she could not be here. She certainly will listen to the oral argument and participate in the decision-making process of this panel. So you may proceed. May it please the Court? Counsel. The issues presented on appeal basically fall into two categories. Whether the Court erred in stating that my client, Walter Johnson, failed to meet his burden of proof that a certain number of his assets were non-marital property. And number two, whether the trial court erred in its various rulings that we believe were unreasonable, arbitrary, and not based on the evidence. And giving a little background of Walter's pre-marital property that he came into the marriage with when they were married in April of 2007. Well, Counsel, I'm just going to stop you there. We have read the briefs. We're familiar with the facts. We've read parts of the records. So I would say it's best to focus on the issues, please. Sure. So the most important asset that we believe the Court found to be partially marital and partially non-marital was Walter's Northeast Investors Trust. Now, he inherited that from his father, did he not? Yes. And why did the trial court treat that asset differently from the other accounts that he inherited? I really can't answer that. The account was valued at $90,444 at the time of the marriage. The Court awarded Walter $90,000 of that asset in its judgment. In June of 18, the asset was valued at $120,506. Now, Walter re-presented all of the statements going back 12 years showing that no money went in or out of this account. It basically was dormant during that time. And Ms. Gilderslee's counsel in their written closing argument, that's part of the record, there was no contest that that asset was not Walter's non-marital property. Okay. So in essence, that's equivalent to a stipulation, correct? I believe so. By which the trial court should have been bound. Exactly, yes. Okay. Number two, and these issues may be a little bit minor, but I believe they're more instructive to some of the more important issues. There's two 529 accounts. In this case, there were two daughters. Walter had a 529 account for one daughter. Ms. Gilderslee had a 529 account for the other. They both had approximately $95,000 in it. The Court ordered that Ms. Gilderslee shall maintain both accounts. But she agreed that they could each maintain one of the accounts, correct? That's what they asked for in their closing argument. There was no testimony really either way at the trial. That ruling was unreasonable. Again, a smaller issue. With respect to the Andigo checking account, however, that was a marital account. It was non-marital to begin with, but it was used as a marital account. Is that not correct? Yes. And we believe that it became marital under really the rationale of the Hinke case. That it was always a sole account. He had the Andigo account prior to the marriage. Prior to the marriage, he deposited all his income in that account. He did that during the marriage. He does that today. According to Hinke, because all his marital income went into that solely held account, it in essence became a marital account. And we don't, never disputed that. We voluntarily stated that at trial. This checking account, now I know it's a bit confusing. There's the Andigo money market account. There's the Andigo checking account. There's the Andigo savings account. We're talking about the checking account now. Right. The checking account was used as a conduit or a hub from which Walter moved money around from his various accounts. And he had several accounts. And at trial, we presented evidence of 88 transactions that occurred over the course of the party's 12-year marriage that occurred. And again, there's the immigrant bank savings account, the Banco Popular savings account, the Capital One savings account. Well, Counsel, didn't the trial judge find that all of the activity in and out of the Andigo checking account and these other non-marital accounts actually transmuted the non-marital property into marital property? That is correct. All right. Why was that finding against the manifest way to the evidence? Because when Walter used that account basically as a conduit, meaning money goes in and that money goes out between two non-marital accounts, we believe that prior case law states that that in and of itself does not transmute non-marital money into marital money. I mean, in Ray, the marriage of Kinky basically states that. In that case, the gentleman asserted that his pre-marital account, like Walter's, because his marital income was deposited in that account, somehow transmuted into non-marital property. And we believe that it doesn't transmute into, in that case, non-marital property. In this case, we believe it doesn't transmute into marital property. But he couldn't testify as to what the monies were used for once they went into that checking account for use. That is correct. Not for all of them. There are some large money transactions where, for example, on one day 7,000 and then 90,000 went into the checking account on the next day from a non-marital account. And on the next day, 97,000 went to a non-marital account. So there are several transactions where you can actually just trace the non-marital money going from one non-marital account, going through the checking, and then to another non-marital account. But didn't he also generally testify that the monies were used to pay general household and family expenses? Yes, Your Honor. And didn't he benefit from that then? Yes. The marital estate, by our calculations, benefited by over a quarter million dollars. $255,000 of Walter's non-marital assets went into the marital estate. We're not asking for any sort of reimbursement of those funds. We're asking that all the funds that remain in his non-marital accounts remain non-marital. Wasn't money sent back to the non-marital account, though, at times? Yes, when it was used as a conduit, but the actual case name escapes me. I want to say maybe it's Crook, but there is no gift presumption when the account, such as Walter's, isn't a joint account. It always was held in his name alone. So I believe... Well, it's held in his name alone, but you've conceded that that checking account became a marital account. Exactly. Yes. So if it's a marital account, what difference does it make whether it's in his name or not? I believe it's pursuant to, I want to say, the case of Crook, where they make that distinction that when an account is jointly held, there is that gift presumption, but when an account is solely The trial court made a specific finding that that money was a gift to the marriage, though. The court said at the record 466, Respondent did also claim that he used $200,000 or more of his non-marital funds toward marital expenses and or improvements during the marriage. This conduct appears to be simply gifts to the marriage by him through, though. I'm sorry. And it appears he conceded this in his closing argument. And I state that now by meaning that over $200,000, the judge is absolutely right, over $200,000 from Walter's non-marital assets went into the marital estate. Again, we're not asking for any sort of non-marital accounts. Not the checking, but the other non-marital accounts retained that non-marital distinction. And the court, in its ruling, basically awarded Walter the value of those accounts as they were at the time of the marriage in 2007. The problem with that is two of Walter's non-marital accounts, the Banco Popular and the immigrant account, that both had approximately $100,000 in 2007, those accounts were subsequently closed. We traced that money, and that money went into other non-marital accounts. Number two is, when the parties were married, they lived in his residence. We call it the Cooper residence in the brief. That was a pre-marital asset. That was a non-marital asset. Now that house was sold in 2014, and those sales proceeds were put into Walter's, one of his non-marital accounts. They did purchase a new house, but those money, the monies from the sale of the old house did not go to the new house. They actually lived in their, in the Cooper residence after they purchased the current marital residence while they were renovating it. So, and that's a separate issue, but those funds from the new house also came out of his non-marital estate. So you can see over the course of the marriage that, again, over a quarter million dollars of his assets went into the marital estate. And again, those are gifts, those were gifts, and we're not asking for any sort of reimbursement on that. The second main issue in our brief was Walter's 401K with Motorola. The parties were married in 2007. He left Motorola in April of 2011, and Walter testified, he was allowed to testify. All of the Motorola 401K records were admitted as evidence via stipulation, and he testified about the value of his 401K at the time he left Motorola, and he did so by year. So in 2007, in which it was partially non-marital, non-marital contributions and marital contributions, he went through his calculations, and the records we were able to obtain had the employee deposits and the employer deposits, and for those years they had a contribution losses figure for that year. So Walter, using just addition, subtraction, multiplication, and division, basically did somewhat of a modified Hunt formula where he was able to... Isn't this a subject of expert testimony, though? I mean, he was awarded the amount that was in the 401K when they got married. Yes and no. They were married in April of 2007. He was awarded the value of the 401K at the end of 2007, beginning of 2018, so at a slightly different time period. As to the addition and subtraction, the problem is the trial court did not find his testimony credible, I believe, because  He did not find his testimony credible. He himself, that is Walter himself, admitted that his calculations weren't accurate. He incorrectly calculated, he had a calculator and pen and paper, he did incorrectly calculate a figure but immediately corrected himself and he testified about the marital and non-marital values of his 401K at the end of 2007. Those values were stipulated to by Ms. Gilderslee's counsel, not only the value of the account but the value of the non-marital portion and the marital portion. He also did the calculations for 2008, which were a little bit easier because all of those deposits were marital at that time. Now he prepared an exhibit in connection with his testimony and his attorney gave an offer of proof with respect to that, but that exhibit is not in the record, is it? The offer of proof is in the record, but the exhibit is not part of the offer of proof, is it? I don't believe so, Your Honor. As for the exhibit, the mathematical calculations, the court ruled that that was argument and so those calculations were included in our written closing argument as well as the brief. As it relates to the offer of proof I made, in the cases I cited, it was denied as a demonstrative exhibit because it was found to be persuasive, but the case law that I cited on the record and in my brief states that there are two types of demonstrative exhibits. One is the non-persuasive and the other is persuasive, and I believe that had Walter been allowed to testify from that exhibit to the court, which found his testimony to be confusing, it would have aided the trier of fact to determine what Walter was doing. Are you talking about the 401K exhibit? Yes. Okay, well again, if you can point to where it appears in the record, it doesn't appear to be in the record, counsel, so if it's not in the record, we can't review that. Sure. I don't believe it's in the record. Your time is up. The buzzer went off, but you will have additional time in rebuttal unless Justice Brook has another question. Thank you. Mr. Williamson? Good morning. Good morning. Counsel, previously laid out the arguments, our main positions that we didn't use for, and I think that was evident from the court's trial ruling, as it related to the transfers that were in and out of the Indigo checking account, as well as the multiple other accounts, Banco Popular and Emigrant, and some of the other accounts that he had labeled. What I believe the job court's basis was, he cherry-picked ADA transactions over an 11-year period, and this is why I put the Henke case controls, and why I put the joint felt in the Henke case controls, is because the money that was coming from his salary was going into his checking account, which he admitted to be a marital account. Now his transaction's also going into that account, and then his transaction's leaving that account. So to be able to tell me that the money that comes in, that gets mixed with the income that he already has in that account, and then transfers out, which dollar is which, and then on top of it, he can't tell you what the purpose was for those transactions. And so my reading of the case law, and my argument as well in the closing was, you didn't properly trace the money coming in and out. So realistically, anything that went through that account would become marital property? Yeah, I believe so. If you can't tell me, if you can't tell us what the purpose of it was. Now, I understand the other cases that talk about transactions that come in and out on a one-day purpose, and then move to another account. But the problem is that on those same days, or days around it, he has other transactions going to those same accounts from the marital checking account. So it's not as simple as the cases that talk about rent deposits, right? The rent comes in, and then that amount is directly paying the mortgage. That's easily traceable. But over an 11-month period, you have, and counsel disputed this, but you have over a million dollars of money coming in and out of those accounts. And so to tell me that 88 transactions were properly traced is, I mean, frankly ludicrous. We spent three days of trial, and the testimony, as this Court has already pointed out, he either said he had no independent recollection of what the transfer was for, or he said it was for marital expenses. And so at that point in time, if you're not telling me that the money went in here, and I immediately used it to invest in a rental property, or I immediately took it and I put it in this investment account, which was totally segregated, the entire marriage, and I never touched it at one point in time. Those are understandable arguments, but that wasn't the argument. The argument is, I spent a bunch of money in the marriage, and I want it back. That's the argument. And so when counsel's saying he's not looking for reimbursement, he is. He's saying, we spent this money, we all benefited from it, and now these accounts that are here, that have had marital money going in, that also had non-marital money in it, and have now been transmuted, at least that's what the trial court found, I want all that, too. So... Did he receive the amounts that were in the accounts at the time of the marriage? Yes. And the only one that counsel just pointed out was the 401k. And the reason the 401k balance was at year end, was because that's the evidence and the testimony that counsel provided to the court. There were no other statements. He subpoenaed the statements, that's what he provided. And again, that's his... Was there evidence that there was some, I think you mentioned two accounts that were closed during the marriage that were non-marital that then went into a different account? There were testimony of transfers from certain accounts into the indigo checking account, which meant... No, no, no, I'm sorry. Closing down two non-marital accounts and putting those into different accounts, did he get credit for that enough pre-marriage? No, because that was part of the ADA transfers that he testified to that went into the indigo checking account. That was the issue. He was moving money from almost six different accounts, and he was only tracking the transfers and not tracking all the other money that had gone into the quote-unquote hub or conduit that he kept using as his term throughout. And the testimony, again, I would say the reason it wasn't persuasive is because literally every transaction that Mr. Bennett asked him about, his answer was, I have no independent recollection of that transfer, or it was used for household expenses. Then on the cross, my question was, do you have any of the documents that would evidence any of these expenses that you spent on? And he said no. And I said, okay, so your answers would be, you either have no independent recollection or you do not, or the money was spent and it was used for a mere purpose. So when those two accounts were closed, that money was transferred through the conduit? Correct. Now, a couple other items that were talked about, the Northeast Investors Trust account, there was a stipulation that that is his non-marital, and there was no reason that was treated the same way. And you're not arguing differently now, are you? No. With respect to that, or the Honda automobile, for example, which she agreed was to be his, and the two college accounts, they were to have each manage one of them. So, great question. Those three issues. I believe the purpose of the awards were because there was absolutely no testimony listed. And what the court had said to us, immediately upon agreeing to put all these documents in the evidence, was I'm not going to just sift through a bushel basket and do your work for you. You need to elicit testimony and ask questions. Right, but in your closing, I think you referred to the stipulation there, so they wouldn't have... So what I referred to in the Northeast Investors Trust was that the account statement that he provided was that the account was established on marital, and then I agreed with that balance at the time of the marriage, and that there was a new balance. There was no testimony as to how that balance accrued. There was no testimony whether or not the money, there was money moved in and out of it. And so I guess that's why the court made that ruling as it related to the car. That's a little bit more of a different issue. That was my decision. I didn't have it, but I want half the value, which was stipulated to $4,150. And then as to the 529, I can't really tell you. The courts recently, they both had individual 529 plans and the court awarded my client Davie. He felt that in the future, she was the better custodian. But are you taking a different position now on appeal than you took in the trial court with respect to these three issues? It seems to me you are. No, I think my position is consistent. And I think counsel is saying my position is different, but my position is, I don't disagree with what the trial court did, because ultimately, the trial court is the trier of fact. He is the one that determined how to divide these accounts. If he felt that there was not sufficient evidence, even though there was a stipulation as to the balances, I'm not here to dispute that. However, I do not have a disagreement that the Northeast Investors Trust was an account that was gifted to Mr. Johnson. As to the court's ruling, which was he got the balance on the date of the marriage, and then the appreciation, which was unclear, I think is what he divided between the parties. That was my position. But there was never any evidence or testimony that there was anything in or out of that, either? No. You're right. Correct. And you stipulated that it was his non-marital account. You did not stipulate, but it was said in your argument. And you didn't ask for the increase, half of the increase in value. I did not request anything as it related to that account. So I'm not saying my, I guess I'm answering the question, I don't believe that my closing is inconsistent with my position in my brief. I just, I'm saying that I'm staying consistent with what the trial court's ruling was. As to 529, I don't have any issue if he wants to manage his own account. I don't know why the court did that, but my, again, my position is, if the trial tried back, felt that it was better for my client to control those two custodial accounts, fine. And I understand the rules as it relates to 513H. I was here yesterday giving a brief on the issue of 513H, so I know that that was a counsel goes straight to the kids portion at the time in which they were appelled. So that one seems to be a non-issue, but, again, I have no dispute on what the appellate court would like to do with that. And the car, again, my position is, she should have gotten the value for that car, and the court gave her the car. However, I believe now the car doesn't even exist, so that might be a different issue. I have two questions. One, what was your request for $20,000 in fees based on, and what was the $25,000 assessment in attorney's fees against Walter based on? My position as related to $20,000 was that I felt that the trial was unduly burdensome and litigious. I don't believe that Mr. Johnson proved his case. I believe that, in fact, it cost the parties more money to go through what we went through, and that's the purpose of me asking for $20,000. But you asked for the $20,000 under A or B, did you not, in your motion? I did. What does A have to do with litigiousness? A obviously is a contribution request. B is relative to undue litigiousness, and so I asked for one, because he had a greater sum of assets in his control. That was the contribution argument. And B was because we went to trial over an issue that I don't believe was found to be with merit. And so you were asking for $20,000, the entire $20,000 because of litigiousness or the fact that you felt that this was a frivolous issue, et cetera? Sure. Is that what you're saying? I'm asking for it both ways. I'm saying, what do you mean both ways? I'm cleaning it under A and B, because he had a greater sum of money at the end. Okay, so for attorney's fees in general? Correct. All right. Correct. And B, you were asking for it because of litigiousness. Sure. I pled it two different ways. And then I believe the reason the court had $25,000 was because that was what my client had outstanding, and that's what she testified to at the time of trial. Even though she incurred more during trial. There was a subpoena issue and a motion to quash that subpoena on the issue of fees, correct? There was. And the judge entered and continued that until sometime later and then never got to it. Sure, but under the rules, the trial court can award attorney's fees under a 508A or a 508B without a hearing at trial because the same evidence is going to be hearing that's going to hear the exact same evidence. He has the ability to do that. Now, isn't the only thing the trial judge said about Walter's supposed litigiousness was that the 401K testimony was a, quote, somewhat, quote, lengthy part of the trial that made it go longer than it should have? Wasn't that the extent of his comment with respect to? I don't think that's the only comment. I think he also said that his explanation was unintelligible, if I remember correctly. That was another part of what he said. In general, as it related to his tracing and not only to the checking, but also to the 401K. Don't quote me, but I believe that that's the actual word he used. And how long was the testimony regarding 401, the 401K, approximately? It was a three-day trial. I believe my client was on a stand for at most half a day, so the remaining part of that was his testimony and probably half of that was his client. And during the 401K testimony, which is probably not evident from the transcript, there was approximately 35 minutes where he sat in a stand with a pencil and paper and calculator. Right. So, would you say, I mean, eight hours for the 401K? I couldn't say, honestly. I couldn't tell you a specific amount. Well, if we took eight hours, that's $2,680. How does that compare with $25,000? I'm sorry, how do you get to $2,000, but I'm not following. Well, the hourly rate. Okay, if it's eight hours. Oh, you're taking my hourly rate at $400 an hour. Right. Well, I'm just trying to figure out how the trial court got to $25,000. Your Honor, I think it was premised on what was outstanding at the time of trial. I believe he probably took the 503 and 504 factors, and his award was not only based in 508B, but was also based in 508A. But that's your own speculation. That's my own speculation. But there's nothing. Can you point us to anything in the record? No. No, but I also don't think that counsel proved by satisfied his burden that there was an abuse of discretion as it relates to that amount. So, I mean, I'd be remiss to say that I don't know that it's my burden to prove that the court's ruling was just. I think it's his burden to prove to the court that it was an abuse of discretion. Was it a B burden to prove? Right. That's why, I mean, it's just so unclear. And the fact that the judge, to some extent, led opposing counsel down the path that we'll get to this later and then all of a sudden it just pops up in the court's ruling. Well, I think, so as it relates to, we'll get to this later, the motions were noticed up and then counsel issued a subpoena. And the reason for the motion to quash was because the attorney fee records contain attorney-client privilege. And so if we're going to go to trial, I can't obviously divulge my attorney records at that point in time. And I think then at that point in time as we went to trial, again, I'm assuming this is why the trial court did it, but I don't know because I'm not judging Trump's head, is that he felt that there was enough evidence at that point in time either by way of 508, 503, 504 or by way of maybe his opinion as it related to 508B that, in 508A, that award was trusted. But he never had a hearing at the end of the trial on the issue of reasonableness either, did he? No, but I don't think, but I don't actually, but I don't think that that's what the case law and the statutory law require. I think that the Court can make a ruling for contribution to attorneys, and I think that the Court can make a ruling. But you said he did not want to go ahead and rule on the motion to quash because of the attorney-client privilege during the course of the trial. He didn't get to that period, did he, before he made his ruling at the end of the trial? He did not rule on the motion to quash, if that's what your question is. And he didn't hold any other hearing with regard to the attorney's case? He didn't. Okay. Do you have anything else? Okay. Thank you, Counsel. All right. Mr. Johnson. Or Mr. Bennett. I'm sorry. We've got a new way of looking at the names here, and we have to get used to it. I apologize to you. Please forgive me. Thank you. As to the attorney's fees, another issue to consider was that this case was bifurcated, and Ms. Gilderslee, about six months before the trial, filed a motion to modify the allocation judgment, which had previously been entered I believe the summer before. And a guardian ad litem had been appointed, but the trial court, hoping to resolve the divorce, rescheduled the trial just to resolve the remaining financial matters so the guardian ad litem could do his investigation as it relates to the children. So when it comes to attorney's fees, another issue that was not taken into account by the trial court is the amount of attorney's fees that were incurred for the child-related matters versus the attorney's fees for the financial matters. And to answer your question, Walter's testimony regarding the 401k was not eight hours. He testified about 2007 and 2008, and because Ms. Gilderslee stipulated to those calculations for both years, he did not testify about 2009, 2010, 2011, because they would be the same type of calculations. And that in and of itself, I believe, shortened the testimony by Walter. Those stipulations, I believe, in the trial court's findings were somewhat disregarded by the court. And was it the court that allowed Walter to go on and testify regarding the 401k even after he denied admission of the exhibit and the offer of proof? Yes, Your Honor. And to the point that the court chose to award Walter the balances of his non-marital assets as they existed at the time of the marriage, that doesn't obviously include the balance of the Banco Popular account, because that was closed. That had approximately $100,000. So did the court choose to award him $100,000 because that money was sent into the marital account, the checking account? And that we don't know what happened to it. And that, I believe, is incorrect. There was a term that we cherry-picked the transactions that amounted to the ADA transactions. No. We took all of the transactions of money going out and in between the marital account and his non-marital accounts. And those transactions amounted to the ADA that are in those tables in my closing argument and in the brief. And there was no testimony at trial that there were other transactions that should have been included or anything like that. And if you look at some of those tables, there are some very large transactions that can be identified. And I believe that was to the court's point, namely the sales proceeds of the Cooper residence. But we can't look at those, can we? Those were not admitted into evidence, were they? Those charts? You included them in your brief on appeal. But doesn't the record reflect the trial court denied admission of that exhibit? No. I had attempted to admit demonstrative exhibits that just laid out the transactions for accounts. Those were not admitted. The court stated that those were arguments. So they were included in our written closing, in my written closing argument, which is part of the court's record. I'm sorry, say that one more time so I absolutely understand you perfectly. The charts in the brief were included in Mr. Johnson's written closing argument that was submitted to the court and is part of the appellate record. Had they been labeled an exhibit, those charts? Those were barred from being admitted at trial on the basis that they were argumentative. Right. So you included them as part of your argument. And that's why they were in your closing argument. Yes. And that's the context in which they appear in the record in this case, in your closing argument below. Excuse me. Is that the context? Because they were in your written closing argument below, that's how they're in the record on appeal here. Is that correct? That is not the only basis, Your Honor. I cite to every transaction that Walter testified to because the charts were not admitted at trial, we went through all of the transactions, all 88 transactions individually at trial. They're on the record. He cited to the particular bank statements which were admitted. So I treated the closing argument somewhat like a brief where we cite in the record where the testimony was as well as the page of the particular exhibit. So Walter did testify to every single one of those transactions and a lot of those transactions he did have an independent recollection of, especially the larger transactions or the transactions where you can see on the tables that it was, you know, the checking account did act as a conduit. Thank you very much, Counsel. Thank you, Your Honor. Thank you both for your arguments this morning. The Court will take the matter under advisement.